**FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
\* OCTOBER 16, 2025 \*
BROOKLYN OFFICE**

JPL:KTF/BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ERIC EARNEST,
    also known as "Spook,"
MARVES FAIRLEY,
    also known as "Vez," "Vezino"
    and "Vezino Locks,"
SHANE HENNEN,
    also known as "Sugar,"
DAMON JONES,
    also known as "D Jones" and
    "Dee Jones,"
DENIRO LASTER,
    also known as "Niro," "Payso"
    and "Peso," and
TERRY ROZIER,
    also known as "Scary Terry" and
    "Chum,"

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____ **25-CR-323**
(T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1),
982(b)(1), 1349, 1956(h) and 3551 et
seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

**Judge Rachel P. Kovner
Magistrate Judge Joseph A. Marutollo**

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

## I.   The Defendants and Relevant Entities and Individuals

### A.   The Defendants

    1.   The defendant ERIC EARNEST, also known as "Spook," was a resident

of Missouri.

2.     The defendant MARVES FAIRLEY, also known as "Vez," "Vezino" and "Vezino Locks," was a resident of Mississippi.   FAIRLEY represented himself on Instagram as a successful sports bettor and sold sports betting picks through his Instagram profiles.

3.     The defendant SHANE HENNEN, also known as "Sugar," was a resident of Pennsylvania and Nevada.   HENNEN represented himself on Instagram as a successful sports bettor and sold sports betting picks through his Instagram profiles.

4.     The defendant DAMON JONES, also known as "D Jones" and "Dee Jones," was a resident of Texas.   JONES was a National Basketball Association ("NBA") player from approximately 1999 through 2009 and an NBA coach from approximately 2016 through 2018.

5.     The defendant DENIRO LASTER, also known as "Peso," "Payso" and "Niro," was a resident of Ohio.

6.     The defendant TERRY ROZIER, also known as "Scary Terry" and "Chum," was a resident of Ohio, North Carolina and Florida.   ROZIER was a professional basketball player who has played in the NBA since 2015.   During the 2022-2023 NBA season, ROZIER played for the Charlotte Hornets.   ROZIER was close friends with the defendant DENIRO LASTER, and they had known each other since childhood.

B.     The NBA and the Betting Companies

7.     The NBA was a professional basketball league in North America. Among others, NBA teams included the Charlotte Hornets, Chicago Bulls, Cleveland Cavaliers, Los Angeles Clippers, Los Angeles Lakers, Milwaukee Bucks, New Orleans Pelicans, Oklahoma City Thunder, Orlando Magic, Philadelphia 76ers, Portland Trail Blazers, Sacramento Kings and Toronto Raptors.   The NBA maintained codes of conduct applicable to its players, coaches and

management that prohibited, among other things, wagering in connection with NBA games or providing non-public information relating to NBA games to others. Such codes of conduct also required NBA players, coaches and management to provide their best services and loyalty to their teams.

8.      NBA teams were required to report to the NBA information concerning player injuries, illnesses and rest for all NBA games. On each gameday, the NBA disseminated an "injury report" for each NBA team playing that day. The injury reports identified players as falling within one of the following categories: "available," "probable," "questionable," "doubtful" and "out." The injury reports were updated multiple times throughout each gameday.

9.      Betting Companies 1 through 4, entities the identities of which are known to the Grand Jury, were licensed gambling companies operating in the United States that offered sports betting services (collectively, and together with other online sportsbooks and retail sportsbooks, the "Betting Companies"). The Betting Companies offered sports betting services relating to, among other things, NBA games and individual players' statistical performances in NBA games. Since approximately 2021, Betting Company 1 and Betting Company 2 have been the co-official sports betting partners of the NBA.

C.      Other Relevant Individuals

10.     Long Phi Pham, also known as "Bruce," was a resident of Queens, New York.

11.     Timothy McCormack was a resident of New York, New York.

12.     Jontay Porter was a resident of Missouri. Porter was an NBA player during the 2023-2024 NBA season.

3

13.     Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a resident of Florida.   Co-Conspirator 1 was at times an NBA player.

14.     Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a resident of Pennsylvania.

15.     Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was a resident of Louisiana.

16.     Co-Conspirator 4, an individual whose identity is known to the Grand Jury, was a resident of Michigan.

17.     Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was a resident of Pennsylvania.   Co-Conspirator 5 was a relative of the defendant SHANE HENNEN.

18.     Co-Conspirator 6, an individual whose identity is known to the Grand Jury, was a resident of Ohio.   Co-Conspirator 6 was a relative of the defendant TERRY ROZIER.

19.     Co-Conspirator 7, an individual whose identity is known to the Grand Jury, was a resident of North Carolina.   Co-Conspirator 7 was a relative of the defendant DENIRO LASTER.

20.     Co-Conspirator 8, an individual whose identity is known to the Grand Jury, was a resident Oregon.   Co-Conspirator 8 was an NBA player from approximately 1997 through 2014, and an NBA coach since at least 2021.

21.     Co-Conspirator 9, an individual whose identity is known to the Grand Jury, was a resident of Brooklyn, New York.

4

II.     Background on Sports Betting

22.     In or about 1992, following several high-profile sports-betting scandals, the United States Congress passed the federal Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, which banned all but four states from sponsoring, authorizing, operating or regulating sports wagering.   The four excepted states—Nevada, Oregon, Delaware and Montana—had existing sports wagering regimes that PASPA grandfathered in.

23.     In or about 2018, following years of litigation between the State of New Jersey—which desired to legalize sports betting—and several major American professional and college sports leagues, the United States Supreme Court struck down PASPA as unconstitutional. In the ensuing years, sports betting, and particularly online sports betting, became legal in dozens of states.

24.     The Betting Companies operated online mobile applications, branded retail sportsbooks at various casinos nationwide, or both.   Online wagers made through the Betting Companies' online mobile applications were made pursuant to the Betting Companies' respective terms of use.   Wagers made at retail sportsbooks were made pursuant to the sportsbooks' house rules.   Among other things, the terms of use and house rules generally prohibited users from wagering in connection with sporting contests when the wagers were based on or the users had access to pre-release, confidential information or other non-public information.   The terms of use and house rules also prohibited individuals from using others to place wagers on their behalf, otherwise known as straw betting.

25.     Despite the recent widespread legalization of sports betting, unlicensed bookmakers or "bookies" also offered sports betting services to bettors.   Bookies frequently accepted bets on bespoke betting websites that allowed users to place various types of wagers on

sporting contests based on publicly available betting lines.   Unlike legal sportsbooks, bookies typically "settled up" the bettors' wagers (i.e., received payment from and/or paid the bettors in connection with the wagers) offline, generally through cash, peer-to-peer payments or cryptocurrency transactions.

26.    A "proposition" or "prop" bet was a bet made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's outcome.   For example, a bettor might wager that a particular player would score more (referred to as betting the "over") or fewer (referred to as betting the "under") points than a certain number of points designated by the betting operator for a given game.   Prop bets took many forms.   For example, a bettor could place prop bets on the points, rebounds, assists, minutes played and/or three-pointers made by individual NBA players.

27.    A "money line" bet was a bet placed on a game's outcome (i.e., which team would win or lose the game).   Relatedly, a "point spread" or "spread" bet was a bet placed on the margin of victory or defeat in a given game.

28.    A "parlay" bet was a bet that was comprised of two or more individual bets (as opposed to a "single" or "straight" bet, which was comprised of one individual bet). For a bettor to win a parlay bet, each bet, or "leg," within the parlay bet had to be successful.

29.    A "betting line" or "line" was a number set by oddsmakers to represent the expected outcome of a particular event.   In the context of prop bets, a betting line was the number set by oddsmakers for a given outcome.   For example, an oddsmaker might set the betting line for a given player's points in a given game at 20.   Bettors would then have the choice to bet the "under" (i.e., that the player will score fewer than 20 points in the game), or the "over" (i.e., that the player will score more than 20 points).   Oddsmakers had proprietary

6

processes for setting betting lines, but betting lines generally took into account all publicly known information relevant to a given bet.

III.    The Fraudulent Wagering Scheme

30.    In or about and between December 2022 and March 2024, the defendants ERIC EARNEST, MARVES FAIRLEY, SHANE HENNEN, DAMON JONES, DENIRO LASTER and TERRY ROZIER, together with others, participated in a scheme to defraud the Betting Companies by providing, obtaining and using non-public information relating to NBA games to place and cause others to place fraudulent sports wagers for profit, and to launder the proceeds thereof.

31.    The fraudulent wagering scheme typically involved various iterations of the same pattern within a network of co-conspirators.   The defendants and certain co-conspirators had access to private information known by NBA players or NBA coaches that was likely to affect the outcome of upcoming NBA games or individual players' performances. They provided other co-conspirators this non-public information—in exchange for either a flat fee or a share in expected wagering profits—for the purpose of betting.   The co-conspirators disseminated the non-public betting information through a network of individuals who placed bets on the co-conspirators' behalf, placed wagers on their own behalf, or directed others to place wagers, all with the intention of profiting off the scheme at the expense of the Betting Companies.   As a result, many of the wagers were placed in connection with betting lines that did not reflect or account for the private information known by the defendants and their co-conspirators, rendering the wagers more profitable.

32.    The defendants and their co-conspirators placed and caused others to place these fraudulent wagers through the Betting Companies' mobile applications and retail

sportsbooks.   In doing so, the defendants and their co-conspirators made and caused others to make materially false and misleading statements and representations to the Betting Companies, and to omit to state one or more material facts which made what was represented under the circumstances misleading, including that the wagers were placed in accordance with the Betting Companies' terms and conditions and house rules prohibiting, among other things, wagering based on non-public information and straw betting.

33.    In many instances, the defendants and their co-conspirators' fraudulent bets were successful and were paid out by the Betting Companies.   The Betting Companies would not have paid bettors for successful wagers had they known that the bettors possessed non-public information pertaining to the event or were placing the wagers at the direction of and for the benefit of others.

34.    In furtherance of the scheme and to conceal the proceeds derived from it, the defendants and their co-conspirators engaged in and caused others to engage in transactions between and among themselves and others acting on their behalf including peer-to-peer payment platform transfers, bank wires and cash exchanges.

35.    Examples of some of the fraudulent wagers and the laundering of proceeds thereof are set forth below.

A.    <u>The March 23, 2023 Charlotte Hornets Game</u>

36.    During the 2022-2023 NBA season, the defendant TERRY ROZIER played for the Charlotte Hornets.   Prior to the Hornets' March 23, 2023 game against the New Orleans Pelicans (the "March 23 Game"), ROZIER informed the defendant DENIRO LASTER that ROZIER was going to prematurely remove himself from the game in the first quarter due to a supposed injury and not return to play further.   ROZIER provided this information to

LASTER for the purpose of enabling LASTER to place wagers based on this information. ROZIER was not on the Hornets' injury report prior to the March 23 Game and Hornets officials were not aware of ROZIER's plan to exit the game prematurely.   The public, including the Betting Companies, was also not aware of ROZIER's plan to exit the March 23 Game prematurely.

        37.      The defendant DENIRO LASTER sold the information about the defendant TERRY ROZIER's plan to leave the March 23 Game early to multiple co-conspirators, including to the defendant MARVES FAIRLEY and Co-Conspirator 1, to enable them to place fraudulent wagers based on the non-public information.   In exchange for the information, FAIRLEY and Co-Conspirator 1 agreed to pay LASTER approximately $100,000 from their expected fraudulent gambling winnings.   Prior to the March 23 Game, FAIRLEY, LASTER and Co-Conspirator 1 exchanged text messages confirming that ROZIER planned to exit the game prematurely and confirming their plan to place wagers on ROZIER's unders (i.e., that ROZIER would underperform relative to the oddsmakers' betting lines for his individual performance).

        38.      The defendant MARVES FAIRLEY also provided the information to the defendant SHANE HENNEN so that HENNEN, both himself and through a network of straw bettors, could place bets on the defendant TERRY ROZIER's unders.   FAIRLEY provided the information to HENNEN and HENNEN agreed to place and direct his associates to place bets on ROZIER's unders based on an agreement between them that HENNEN would give FAIRLEY a share of the profits from his and his associates' winning bets.

        39.      On or about March 23, 2023 and prior to the start of the March 23 Game, the defendant SHANE HENNEN placed multiple bets at a retail sportsbook operated by Betting

Company 3 totaling approximately $61,200, all of which were either straight or parlay bets on

the defendant TERRY ROZIER's unders.    In addition to placing bets on ROZIER's unders

himself, HENNEN marshalled a network of associates to place bets on ROZIER's unders at

HENNEN's direction, including, but not limited to, the following bets, all of which were placed

on or about March 23, 2023, prior to the start of the March 23 Game:

          (a)     Co-Conspirator 2 placed multiple straight or parlay bets on

ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting

Company 1's mobile application totaling approximately $107,000.

          (b)     Timothy McCormack and Long Phi Pham placed multiple straight

or parlay bets on ROZIER's unders at a retail sportsbook located in New Jersey and operated by

Betting Company 1 and on Betting Company 1's mobile application totaling approximately

$41,000.    Hours earlier, McCormack received two payments totaling approximately $40,000 via

a peer-to-peer mobile payment platform that McCormack and Pham used to fund the above-

described wagers on ROZIER's unders.    While located within the Eastern District of New York,

Pham, among other things, engaged in communications regarding and in furtherance of the

fraudulent wagering scheme.

          (c)     Co-Conspirator 3 placed multiple straight or parlay bets on

ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting

Company 1's mobile application totaling approximately $20,000.

          (d)     Co-Conspirator 4 placed multiple straight bets on ROZIER's

unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's

mobile application totaling approximately $17,000.

(e)     Co-Conspirator 5 placed multiple straight bets on ROZIER's unders at a retail sportsbook operated by Betting Company 4 totaling approximately $12,500.

40.    In addition to the defendants and their co-conspirators, others in the defendant TERRY ROZIER's close circle placed wagers on ROZIER's unders in connection with the March 23 Game.    For example:

(a)     Co-Conspirator 6 placed an approximately $800 bet using Betting Company 1's mobile application on ROZIER's under points.    Since approximately 2022, Co-Conspirator 6 has placed dozens of bets on ROZIER's performances in various NBA games via Betting Company 1.    Every one of those bets—with the exception of the under bet on ROZIER's points in connection with the March 23 Game—was an over bet.    Co-Conspirator 6's bet on ROZIER's unders was successful and Co-Conspirator 6 was paid approximately $1,500 by Betting Company 1.    In the days following the March 23 Game, Co-Conspirator 6 placed multiple additional bets using Betting Company 1's mobile application and lost approximately $4,000.    Following that string of losses, Co-Conspirator 6 texted the defendant DENIRO LASTER, "I lost that shit on [Betting Company 1] ima give you a lite sack when I see u" and LASTER responded, "Bet."

(b)     On or about the morning of March 23, 2023, a relative of LASTER created an online account with Betting Company 1 and shortly thereafter placed an approximately $4,000 parlay wager on ROZIER's unders for the March 23 Game.    This wager was funded by Co-Conspirator 7—who on prior occasions in the context of discussing sports betting, had asked for and received from LASTER non-public information relating to ROZIER's health status.

11

41.     During the March 23 Game, the defendant TERRY ROZIER removed himself from the game in the first quarter and did not return.   ROZIER played approximately nine minutes and 34 seconds, well below his season average of approximately 35.3 minutes per game.   ROZIER scored five points, recorded two assists and made one three-point shot, which were all well below his per-game averages of approximately 21.1 points, 5.1 assists and 2.6 three-pointers and below the lines set by oddsmakers for ROZIER's points, assists and three-pointers in the March 23 Game.   ROZIER collected four rebounds, which was in line with his per-game average of approximately 4.1 rebounds and above the line set by oddsmakers for ROZIER's rebounds in the March 23 Game.   ROZIER's early exit from the March 23 Game and his related underperformance relative to his season averages for points, assists and three-pointers resulted in the success of numerous fraudulent wagers placed on ROZIER's unders by the defendants and their co-conspirators.

42.     On or about March 28, 2023, the defendant MARVES FAIRLEY traveled to Philadelphia, Pennsylvania to collect proceeds from the defendant SHANE HENNEN from the successful wagers HENNEN and his associates placed on the March 23 Game, as well as proceeds from other fraudulent wagers FAIRLEY and HENNEN made in connection with the fraudulent wagering scheme.   On or about March 28, 2023, the defendant DENIRO LASTER also traveled to Philadelphia to collect from FAIRLEY proceeds from the fraudulent wagering scheme relating to the defendant TERRY ROZIER's performance in the March 23 Game. ROZIER arranged and paid for LASTER's travel to Philadelphia.   In or about and between the late-night hours of March 28, 2023 and the early morning hours of March 29, 2023, FAIRLEY gave LASTER tens of thousands of dollars in cash as payment for the non-public information

12

that LASTER had obtained from ROZIER and had provided to FAIRLEY regarding ROZIER's plan to exit prematurely from the March 23 Game.

43.    After the defendant DENIRO LASTER collected his cut of the fraudulent wagering scheme proceeds from the defendant MARVES FAIRLEY, LASTER drove from Philadelphia to the defendant TERRY ROZIER's home in Charlotte, North Carolina.    LASTER arrived in Charlotte on or about March 30, 2023 and met ROZIER at his home that day.    During the early morning hours of April 1, 2023, LASTER and ROZIER counted the money that LASTER had obtained from FAIRLEY in Philadelphia.

B.    The March 24, 2023 Portland Trail Blazers Game

44.    On or about March 24, 2023, the Portland Trail Blazers played the Chicago Bulls (the "March 24 Game").    Prior to the game, the Trail Blazers' record was 32-40 and the team was out of playoff contention with only 10 games remaining in the season.    Prior to the March 24 Game, Co-Conspirator 8 told the defendant ERIC EARNEST that the Trail Blazers were going to be tanking (i.e., intentionally losing) to increase their odds of getting a better draft pick in the upcoming NBA draft.    Co-Conspirator 8 told EARNEST, before the news was publicly announced, that several of the Trail Blazers' best players, including Player 1, an individual whose identity is known to the Grand Jury, would not be playing in the March 24 Game.    The information that the Trail Blazers would be tanking and not playing Player 1 was not available to the public, including the Betting Companies.

45.    Prior to the March 24 Game, the defendant ERIC EARNEST provided this non-public inside information to the defendant MARVES FAIRLEY so that FAIRLEY could place fraudulent wagers on the game and share the profits with EARNEST.    In exchange, FAIRLEY ultimately promised to pay EARNEST at least $5,000 if the bets against the Trail

Blazers were successful.   In addition, FAIRLEY texted EARNEST a screenshot of a purported $20,000 wire transfer from FAIRLEY's bank account to EARNEST, accompanied by the message "Address for wire."

      46.    After the defendant MARVES FAIRLEY learned from the defendant ERIC EARNEST that the Trail Blazers planned not to play their best players in the March 24 Game, FAIRLEY conveyed that non-public information to Co-Conspirator 1.   FAIRLEY and Co-Conspirator 1 agreed to split the profits on successful wagers they could place against the Trail Blazers.

      47.    Before these key Trail Blazers players were publicly ruled out of the March 24 Game, the defendants MARVES FAIRLEY and SHANE HENNEN, themselves and together with their co-conspirators including Co-Conspirator 1, placed and caused the placement of multiple bets that the Trail Blazers would lose the March 24 Game totaling more than approximately $100,000.   For example, between approximately 12:00 p.m. EST and 7:00 p.m. EST on March 24, 2023, which was before the key Trail Blazers players were publicly ruled out, Timothy McCormack and Long Phi Pham, acting together and with Pham acting at HENNEN's direction, placed bets against the Trail Blazers of approximately $20,000 through Betting Company 1's mobile application and approximately $12,000 through Betting Company 2's mobile application.

      48.    The NBA injury reports publicly released at approximately 1:30 p.m. EST and 2:30 p.m. EST on March 24, 2023 reported that Player 1 was, respectively, "probable" and then "questionable" to play in the March 24 Game.   At approximately 9:30 p.m. EST on March 24, 2023—approximately half an hour before the start of the March 24 Game—the NBA released an injury report listing Player 1 and others as "out" for the game.   The "out" group

included the Trail Blazers' four highest per-game scorers during the 2022-2023 season.   The

betting lines relating to the March 24 Game changed upon the public release of the Trail Blazers'

key players' injury statuses.

49.     The fraudulent wagers against the Trail Blazers placed and caused by the

defendants MARVES FAIRLEY and SHANE HENNEN, together with co-conspirators acting at

their direction were successful, as the Bulls beat the Trail Blazers 124-96.

C.     The April 6, 2023 Orlando Magic Game

50.     On or about April 6, 2023, the Orlando Magic played the Cleveland

Cavaliers (the "April 6 Game").   The defendant MARVES FAIRLEY and Co-Conspirator 1

leveraged Co-Conspirator 1's personal relationship with one of the Magic's regularly starting

players, Player 2, an individual whose identity is known to the Grand Jury, to obtain non-public

information about the April 6 Game which they used to place at least one successful wager.

51.     Hours before the April 6 Game, Player 2 told Co-Conspirator 1, before the

news was publicly announced, that the Magic would not be playing its entire regular starting

lineup (i.e., the team's best players) in the April 6 Game.   After receiving this information, Co-

Conspirator 1 provided this information to the defendant MARVES FAIRLEY.   At the time that

Co-Conspirator 1 shared this information with FAIRLEY, the Magic were favored to win the

game by approximately nine points.   Shortly thereafter, FAIRLEY placed an approximately

$11,000 wager with an unlicensed bookmaker that the Cavaliers would cover the game's spread

of 9.5 points, that is, the bet would be successful if the Cavaliers won the game outright or lost

the game by nine points or fewer.

52.     The Magic did not play its entire regular starting lineup in the April 6

Game and the betting lines changed upon the public release of information relating to the

Magic's starting lineup.    The Cavaliers beat the Magic by 24 points in the April 6 Game, thus rendering FAIRLEY and Co-Conspirator 1's fraudulent bet against the Magic successful.

      D.    <u>The February 9, 2023 and January 15, 2024 Los Angeles Lakers Games</u>

      53.    The defendant DAMON JONES was a former NBA player and assistant coach.    JONES played in the NBA from approximately 1999 through 2008, including as a member of the Cavaliers from approximately 2005 through 2008.    JONES was an assistant coach on the Cavaliers from approximately 2014 through 2018.    JONES was also an unofficial assistant coach on the Los Angeles Lakers during the 2022-2023 NBA season.    During many of those years, JONES was a teammate or coach of a prominent NBA player ("Player 3"), an individual whose identity is known to the Grand Jury.

      54.    By virtue of his relationship with Player 3, the Lakers and other NBA personnel, the defendant DAMON JONES had access to non-public information, including medical information that had not been released to the public.    On multiple occasions during the 2022–2023 and 2023-2024 NBA seasons, including as early as approximately December 2022, JONES sold or attempted to sell for profit non-public information to others, including to the defendants ERIC EARNEST and MARVES FAIRLEY and others, for the purpose of causing or enabling them to place fraudulent wagers based on the non-public information.

      55.    For example, on or about February 9, 2023, the Lakers played the Milwaukee Bucks (the "February 9 Game").    On the morning of the February 9 Game, the defendant DAMON JONES sent a text message to Co-Conspirator 9, writing: "Get a big bet on Milwaukee tonight before the information is out!    [Player 3] is out tonight.    Bet enough so Djones can eat to [sic] now!!!"    At the time JONES provided this non-public information about Player 3 to Co-Conspirator 9, Player 3 was not ruled out on the NBA's injury report for the

February 9 Game.   Due to a lower body injury, Player 3 did not play in the February 9 Game,
which the Lakers lost.

56.     On multiple other occasions during the 2023-2024 NBA season, including
in connection with a January 15, 2024 game between the Lakers and the Oklahoma City Thunder
(the "January 15 Game"), the defendants DAMON JONES and ERIC EARNEST sold or
attempted to sell to the defendant MARVES FAIRLEY non-public information for the purpose
of causing or enabling FAIRLEY to place wagers based on the non-public information.   In
exchange, FAIRLEY agreed to pay JONES via EARNEST.

57.     Player 4, an individual whose identity is known to the Grand Jury, was
one of the Lakers' best players during the 2023-2024 NBA season.   Prior to the January 15
Game, the defendant DAMON JONES claimed to have learned from the trainer for Players 3 and
4 that Player 4 was injured and was only going to play a limited number of minutes and/or his
performance would likely be affected in the game because of the injury.   JONES shared this
non-public information with the defendant ERIC EARNEST, who then sent a text message to the
defendant MARVES FAIRLEY stating, "Hit me asap got one for u dude say he got some info."
EARNEST then shared the non-public information about Player 4 with FAIRLEY.   FAIRLEY
paid JONES approximately $2,500, through an intermediary, via a peer-to-peer mobile payment
platform, accompanied by the message: "fee."

58.     After receiving this non-public information and before the January 15,
2024 game began, the defendant MARVES FAIRLEY shared the information with Co-
Conspirator 1 and the defendant SHANE HENNEN.   FAIRLEY and Co-Conspirator 1 then
placed and caused the placement of multiple bets against the Lakers.   For example, FAIRLEY
placed an approximately $100,000 bet against the Lakers at a retail sportsbook operated by

17

Betting Company 2.  Hours before the January 15 Game, the NBA injury report listed Player 4 as "probable," and it was not publicly disseminated, including to the Betting Companies, that Player 4 would possibly play a limited number of minutes and/or poorly due to injury.

59.    Ultimately, Player 4 played in the January 15 Game in line with his season average in minutes and performed well, and the Lakers won the game.  After the January 15 Game, the defendant MARVES FAIRLEY requested, via the defendant ERIC EARNEST, that the defendant DAMON JONES repay FAIRLEY the $2,500 that FAIRLEY had paid for the non-public information.  Despite the Lakers winning the January 15 Game, JONES reaffirmed to EARNEST after the game, including via text message, that he had received credible non-public information regarding Player 4 prior to the game.

E.    The January 26, 2024 and March 20, 2024 Toronto Raptors Games

60.    On or about January 26, 2024 and March 20, 2024, the Toronto Raptors played the Los Angeles Clippers (the "January 26 Game") and the Sacramento Kings (the "March 20 Game"), respectively.

61.    Prior to the January 26 Game and the March 20 Game, Jontay Porter, then a player on the Raptors, agreed with Long Phi Pham and others to exit the game prematurely, on the basis of purported injuries, so that certain of their co-conspirators could place fraudulent wagers on Porter's unders.

62.    Prior to both the January 26 Game and the March 20 Game, Pham provided the non-public information about Porter to the defendant SHANE HENNEN for the purpose of causing or enabling HENNEN to place fraudulent wagers based on the non-public information.  After obtaining this non-public information, HENNEN shared this information with the defendant MARVES FAIRLEY for the purpose of causing or enabling FAIRLEY to

place additional fraudulent wagers based on the non-public information.   After obtaining the non-public information relating to Porter's plan to exit the January 26 Game and the March 20 Game early, HENNEN placed and directed and caused a number of his associates to place wagers on Porter's unders, all of which were successful.   HENNEN conducted multiple transfers via peer-to-peer mobile payment platforms to promote the scheme and distribute the proceeds of such wagers.

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

63.     The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

64.     In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ERIC EARNEST, also known as "Spook," MARVES FAIRLEY, also known as "Vez," "Vezino" and "Vezino Locks," SHANE HENNEN, also known as "Sugar," DAMON JONES, also known as "D Jones" and "Dee Jones," DENIRO LASTER, also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Betting Companies, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

65.    The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

66.    In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ERIC EARNEST, also known as "Spook," MARVES FAIRLEY, also known as "Vez," "Vezino" and "Vezino Locks," SHANE HENNEN, also known as "Sugar," DAMON JONES, also known as "D Jones" and "Dee Jones," DENIRO LASTER also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and intentionally conspire:

(a)    to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i);

(b)    to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of some form of unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the

20

specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(c)    to engage in one or more monetary transactions in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT ONE

67.    The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

68.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT TWO

69.    The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

70.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

22

property of the defendants up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

A TRUE BILL

s/
FOREPERSON

By David Pitluck, Assistant U.S. Attorney

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK